LIN BROADCASTING CORPORATION et al., Respondents, v ME-TROMEDIA, INC., et al., Appellants.

In the Matter of LIN BROADCASTING CORPORATION et al., Respondents, v METROMEDIA, INC., et al., Appellants.

First Department, July 7, 1988

### APPEARANCES OF COUNSEL

*Robert S. Rifkind* of counsel *(Lawrence M. Rolnick* and *Peter L. Skolnik* with him on the brief; *Cravath, Swaine & Moore,* attorneys), for Lin Broadcasting Corporation, respondent.

*Arthur Liman* of counsel *(Samuel J. Silverman, Robert S. Smith* and *Clyde Allison* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for appellants.

### OPINION OF THE COURT

MILONAS, J.

This appeal involves two related lawsuits, each arising out of a cellular telephone business, one serving the New York market and the other the Philadelphia area, in which plaintiffs-respondents, collectively known as LIN, and defendants-appellants, hereinafter referred to as Metromedia, are coventurers. The New York entity, Cellular Telephone Company (CTC) is a partnership, whereas the Philadelphia entity, AWACS, Inc., is a corporation. The first action concerns a claim for specific performance of a contract to compel the sale to LIN by Metromedia of the latter's interest in the New York operation. The second matter seeks to effectuate an appraisal of the Philadelphia business.

Cellular, or mobile, telephone service was first authorized by the Federal Communications Commission in 1981, and the ownership, control and operation of cellular systems is licensed and regulated by that agency. Since substantial long-term capital investment is required, and the financial risks at stake are considerable, joint ventures are apparently common in the cellular telephone industry. Thus, LIN and Metromedia entered into two contracts, the Philadelphia Stock Agreement in 1982 and the New York Partnership Agreement in 1983, for the purpose of engaging in this business beginning at a time when it was still in its infancy. Although there are significant similarities between the two agreements, for reasons of clarity the facts surrounding the two ventures will be discussed separately. Most significantly, the determinative issue with respect to both agreements is the same and has not previously been decided by New York courts, that is, whether

a right of first refusal creates an irrevocable right to purchase even after the proposed third-party transaction has been terminated.

THE NEW YORK AGREEMENT

In March of 1983, LIN and Metromedia formed a partnership, called Cellular Telephone Company, to operate a cellular telephone system for the New York City metropolitan area. The partnership agreement, dated March 18, 1983, contains a right of first refusal provision in section 7.2, which states in pertinent part that: *"Right of First Refusal—Third Party Transactions.* No Partner shall sell, transfer or otherwise dispose of its Ownership Interest except as a whole for cash to a *bona fide* purchaser having a net worth in excess of $25,000,000 (an 'Offeror'), and after giving the other Partners a right of first refusal to acquire such Ownership Interest shall first offer such Ownership Interest to the other Partners, by written notice, at the same price and upon the same terms offered by an Offeror * * * During a period of 45 days after such written notice is received, each other Partner shall have the exclusive right to purchase its Pro Rata share of such Ownership Interest at the appropriate portion of the cash price and otherwise upon the terms and conditions of the offer".

Metromedia subsequently contracted to sell to Southwestern Bell Corporation (Bell) extensive telecommunications and cellular telephone assets for $1.65 billion, among them Metromedia's interests in both CTC and the Philadelphia business. Accordingly, by letter dated July 14, 1986, Metromedia, in compliance with section 7.2 of the New York agreement, notified LIN of the applicable terms of the arrangement with Bell, as well as its right to match the price proposed to be paid by Bell. In that connection, Metromedia stated in part that: "Pursuant to section 7.2 of the above-captioned agreement and said letter agreement, you have the right to purchase Metromedia's partnership interest in CTC and to purchase Metromedia's stock ownership of Cellular Systems, Inc., for an aggregate purchase price of $273,510,000 and on the same terms and conditions as those set forth on Exhibit A, within forty-five (45) days after this written notice is received by you. If you do not notify us within such period, you will have no further rights in connection with the above-described sale".

As LIN considered the proposal, it obtained a series of extensions of time, the last of which expired on September 26,

1986, to enable it to decide if it wanted to exercise its right of first refusal. According to Metromedia, LIN not only failed to match the price Bell was willing to pay, but sought to delay and obstruct both the CTC and AWACS transactions and even challenged Metromedia's right to sell at all. Although negotiations between the parties continued through August of 1986 and into September, Metromedia asserts that it became increasingly concerned that LIN's objections to the sale of Metromedia's interest in CTC and AWACS were jeopardizing the entire deal with Bell. In addition, Metromedia claims that, by this time, it had concluded that these cellular telephone operations represented an attractive investment which should be retained. Metromedia thereupon approached Bell and asked permission to alter the agreement between them to allow it to withdraw its interests in CTC and AWACS from the scope of the arrangement. Bell purportedly acceded to the request on condition that the purchase price for the remainder of the package be adjusted to the detriment of Metromedia. Metromedia accepted Bell's demands, and, on September 11, 1986, they executed an amendment to their agreement. In two separate letters dated September 11, 1986, Metromedia advised LIN that it no longer intended to sell its interests in the New York and Philadelphia cellular telephone businesses and that, therefore, the previous offers to LIN were no longer in effect. It was not until the following week, by letter dated September 18, 1986, that LIN for the first time purported to exercise its right of first refusal under the terms set forth in Metromedia's letter of July 14th. Metromedia responded by reiterating that the sale of its New York and Philadelphia interests had been rescinded and was no longer being contemplated.

### THE PHILADELPHIA AGREEMENT

Pursuant to the Philadelphia Stock Agreement of June 5, 1982, LIN and Metromedia, potential competitors for the Philadelphia cellular license, became stockholders of AWACS. This agreement includes certain restrictions on the transfer of any party's interests in AWACS. Thus, prior to the Federal Communications Commission's grant of the Philadelphia cellular license, no stockholder could sell or dispose of its shares in AWACS to an outside entity, and, after the grant of the license, any sale would be limited to a purchaser possessing resources and qualifications at least equivalent to those of the seller. Moreover, there are two right of first refusal provisions

that apply in the event that a stockholder undertakes the sale of its interests. The first of these is section 7 (c), which states in part that: *"Post-grant Restrictions on Sale of Shares* * * * Furthermore, each of the stockholders shall have a right of first refusal with respect to the shares of the selling stockholder, such that before any party sells its stock pursuant hereto, the other stockholders shall have exactly sixty working days from the date of notification of the terms of a prospective *bona fide* sale in which to tender a purchase offer on the same terms, which offer must be accepted in preference to any offer from a non-stockholder".

Further, section 8 of the contract provides in pertinent part that: *"Consolidation and Sale of Assets* * * * The right to sell or otherwise transfer the shares specified in this Section 8 shall be subject to a right of first refusal whereby the selling stockholder shall notify the other stockholder in writing that it has received a *bona fide* offer from the third party to acquire all or substantially all of such assets. The other stockholder shall have ten days within which to request appraisal of the value of the shares. An appraisal committee shall be promptly established * * * Within thirty days after the receipt of the written appraisal, the other stockholder shall have the right to purchase the shares of the selling stockholder at the Appraised Value".

As it did with regard to the proposed sale of its interests in the New York operation, Metromedia informed LIN by letter dated July 14, 1986 that it had entered into an agreement to sell its interest in AWACS to Bell and that "[p]ursuant to Section 7 (c) of the above-captioned agreement, you have the right to tender a purchase offer to the undersigned for its direct and indirect interests in AWACS for an aggregate purchase price of $94,860,000 and on the same terms and conditions as those set forth on Exhibit A within sixty (60) working days from the date of receipt of this notice by you. If you do not notify us within such period, you will have no further rights in connection with the above-described sale." However, no mention was made of LIN's right to demand an appraisal.

LIN reacted to the contemplated AWACS deal in the same manner as it did when it was apprised of Metromedia's plan to sell its CTC interests: LIN questioned Metromedia's right to transfer its AWACS interests to Bell. Therefore, in a letter dated July 23, 1986, LIN not only protested the sale but asserted that section 8 of the Philadelphia agreement was the

relevant provision rather than section 7 (c). In the same communication, LIN endeavored to invoke its right to an appraisal in the event that the proposed transfer was valid. Notwithstanding the ongoing discussions between LIN and Metromedia with respect to the latter's intention to divest itself of its interests in both CTC and AWACS, in the course of which LIN indicated a willingness to acquire Metromedia's interests in the New York and Philadelphia businesses albeit at a lower price than Bell had offered to pay, Metromedia, as previously noted, abandoned the prospective deal with Bell insofar as CTC and AWACS were concerned. On September 11, 1986, Metromedia formally advised LIN of the cancellation of the sale of its Philadelphia interests to Bell. A week later, in a letter dated September 18, 1986, LIN expressed its intention to proceed with the appraisal.

The dispute between the parties herein ultimately resulted in the instant litigation. Metromedia subsequently moved pursuant to CPLR 3211 to dismiss both of LIN's actions, the one for specific performance relating to the New York operation and the second seeking to compel an appraisal of the Philadelphia venture. In two separate orders entered on December 18, 1987, the Supreme Court denied Metromedia's motion to dismiss and granted LIN's application for an appraisal of AWACS. The court rejected Metromedia's contention that even if section 8 of the Philadelphia agreement was appropriately invoked herein, the right of first refusal only obligated it to make available to LIN the opportunity to match a third-party offer and that, at any time prior to acceptance by LIN at the price fixed by the appraisal, such offer could be withdrawn if the sale to a third party was no longer being considered. In the view of the court, the only reasonable construction of section 8 which is consistent with the language and purpose of the agreement is that once a party "notifies the other of its intention to sell and the response is a proper demand for appraisal, at that point the parties have proceeded into the 'acceptance' phase to the extent the price to be arrived at by appraisal, which right of acceptance may not then be revoked by a withdrawal of the contemplated sale. Any other interpretation would make this provision meaningless."

The Supreme Court was similarly unpersuaded by Metromedia's claim that upon rescission of the offer to sell CTC, LIN was precluded from exercising its right of first refusal. According to the court, "[a]n 'exclusive right to purchase' within a

stated period of time places the non-selling partner in a position beyond that of a mere offeree. Implicit in affirmatively granting to the non-selling partner an 'exclusive right to purchase' for 45 days is the right to compel a sale during the period stated, a right which is inconsistent with any reservation by the selling partner of a right to revoke the offer prior to such period's expiration." Consequently, the court declared, "the only reasonable construction to be given the phrase 'exclusive right to purchase' as used in the instant case is that such right would be irrevocable for the period stated with agreed extensions, the last of which was to September 26th. Thus, LIN's acceptance of Metromedia's July 14th offer of sale prior to September 26th was binding upon Metromedia and its right to compel the sale to it of Metromedia's interest in CTC may be specifically enforced."

As previously noted, the precise issue presented here—whether a right of first refusal creates an irrevocable right to purchase even after the proposed third-party transaction has been abandoned—has never been directly decided by New York courts. While this question did arise in *Quigley v Capolongo* (53 AD2d 714, *affd* 43 NY2d 748) the court therein expressly declined to determine "whether the acceptance of a bona fide purchase offer is enough by itself to activate a right of first refusal if the offer and acceptance are subsequently withdrawn in good faith" (at 715). The reason for the court's ruling was that defendants owners in that case were found to have breached their obligation to deal in good faith with plaintiffs by entering into a contract with a third party with the specific purpose of circumventing plaintiffs' right of first refusal to purchase the property in question. Thus, the agreement between defendants and the third party, while drafted in the form of a lease, actually possessed the essential attributes of a conditional sale or an installment sale and formalized defendants' intention to sell, thereby activating plaintiffs' right of first refusal. Accordingly, the court found, defendants, by failing to provide plaintiffs with the opportunity to exercise their right of first refusal, had breached their contract with them, entitling plaintiffs to specific performance. In the present situation, there is no allegation that Metromedia ever attempted to subvert LIN's right of first refusal; the question here is simply whether Metromedia's initial notification to LIN of its intention to sell constituted an irrevocable right to purchase within the prescribed time period notwithstanding

that Metromedia terminated in good faith its arrangement with the third party.

The issue before us has been addressed on a number of occasions by jurisdictions other than New York, and, not surprisingly, both Metromedia and LIN rely on the authority which supports their respective positions. Therefore, Metromedia cites *Anderson v Stewart* (149 Neb 660, 32 NW2d 140 [1948]), whereas LIN refers to *Vorpe v Key Is.* (374 So 2d 1035 [Dist Ct App, Fla 1979]) and *Henderson v Nitschke* (470 SW2d 410 [Ct Civ App, Tex 1971]). The courts in these cases reached largely contradictory conclusions regarding the matter under consideration here. Thus, in *Anderson v Stewart (supra)*, which involved a lease of realty subject to sale with an option to lessees (appellants) to purchase, the court declared (149 Neb, at 668, 32 NW2d, at 144-145): "Here the appellants had no right to purchase under their agreement unless, during the term of their lease, the owner should decide to sell. Having decided to do so appellee was under legal obligation to offer the property to the appellants and give them a reasonable time to either accept or reject her offer before selling to another on the same terms. Appellee gave the appellants the benefit of this provision by offering the property to them. This offer she was under no obligation to keep open for any definite length of time but could withdraw at any time she desired provided it had not been unconditionally accepted. This she did. Under these circumstances she would be required to give the appellants the same opportunity to buy should she again decide to sell the property during the term of the lease. Nevertheless, she was not obligated to keep the offer made open for the term thereof. The appellants not having unconditionally accepted the offer before it was withdrawn cannot, in the absence thereof, have it enforced and, in the absence of any evidence to show that the appellee has sold or conveyed the property to another during the term of the lease, are not in position to complain."

However, the other two cases hold to the contrary. In *Vorpe v Key Is. (supra)*, also concerning a lease wherein the lessee had a right of first refusal to purchase the leased property, the court determined that once the lessor manifested an intention to sell to a third party, the lessee's right of first refusal was activated, and the lessor's conveyance to a third party conclusively established the lessee's right to buy the property on the terms which the seller had accepted. The fact that the sale was thereafter rescinded by judicial action was deemed by the

court to have no bearing on the lessor's intention to sell. The court in *Henderson v Nitschke (supra)* also concluded that where the lessor of the property, whose written agreement with a third party clearly evidenced an intent to sell, had given notice to the lessee as required by the lease between them, at that point the first right of refusal or preemptive right of purchase matured into an enforceable option. The lessee, the court observed, then had 60 days in which to exercise the option after notice from the lessor of the acceptable bona fide offer notwithstanding that, before the lessee actually elected to exercise the right of first refusal, the lessor advised the lessee that the offer of sale was revoked since the third party had canceled the sale. The court therein attempted to distinguish *Anderson v Stewart (supra)* on the ground that (470 SW2d, at 412): "In deciding that there had not been an unconditional acceptance of the offer before it was withdrawn the court said: 'This offer she was under no obligation to keep open for any definite length of time but could withdraw at any time she desired provided it had not been unconditionally accepted.' The lease in the instant case does provide for a definite length of time. It expressly provides, 'Lessee or its nominee shall have sixty days (60) from the receipt of which notice and offer to buy such property.' "

The distinction perceived by the court in *Henderson v Nitschke (supra)* does not seem to be significant, and it is evident that there exists a valid difference of opinion with respect to the issue before us. However, the rule enunciated in *Anderson v Stewart (supra)* appears to be the preferable one. The primary reason for the inclusion of a right of first refusal restriction on stock or partnership transfers is to prevent a partner or shareholder who wishes to dispose of its interests from forcing an unknown or unwanted partner or stockholders upon the remaining owners. To effectuate that purpose, each partner or stockholder is given the right to preempt a prospective sale by being accorded the opportunity to match the terms which the third party has offered. As defendants aptly contend, the provision simply enables a partner or stockholder to buy in preference to a third party; it is not a device to permit one (or more) partners or shareholders to oust another.

Consequently, the right to purchase pursuant to a right of first refusal clause is conditional upon the other party's willingness to sell. In *R.I. Realty Co. v Terrell* (254 NY 121) a case wherein the lease bestowed upon the lessee the "first privilege

to buy said property for the sum of ($14,000.00) Fourteen thousand Dollars", and plaintiff therein notified defendant that it chose to exercise the option to purchase but defendant refused to convey the premises, the New York State Court of Appeals held that "[t]he words 'first privilege' did not grant an absolute option to the lessee to purchase the premises at any time during the term of the lease. The right of the lessee to purchase depended upon the lessor's desire to sell. If the lessor desired to sell at the price named, then the lessee was to have the 'first privilege to buy' at the figure specified" (at 124). Moreover, unless the language of the applicable contractual provisions state otherwise by expressly creating an irrevocable right, there is nothing to prohibit a partner or shareholder from in good faith changing its mind about selling at any time prior to the invocation of the right of first refusal.

In the present matter, neither the New York nor Philadelphia agreement conferred an irrevocable right to compel a sale. According to section 7.2 of the New York agreement, "[n]o Partner shall sell, transfer or otherwise dispose of its Ownership Interest except * * * after giving the other Partners a right of first refusal". Thus, before a partner decides to dispose of its interests in CTC, it must make available to the other partner(s) the chance to purchase on the same terms as the third party. In that connection, Metromedia fully complied with this provision by giving LIN the opportunity to match Bell's offer. After Metromedia canceled the deal with Bell as to CTC, it was not precluded from withdrawing the offer made to LIN so long as LIN had not yet elected to purchase. Similarly, under section 7 (c) of the Philadelphia Stock Agreement, "each of the stockholders shall have a right of first refusal * * * such that before any party sells its stock pursuant hereto, the other stockholders shall have exactly sixty working days * * * in which to tender a purchase offer on the same terms". However, where the seller no longer wishes to divest itself of its stock, nothing in the contract compels it to follow through with the sale, and the right of first refusal, unless it has already been exercised, is no longer operative. As for section 8 of the Philadelphia agreement, it is clear that this clause does no more than establish a mechanism—an appraisal of the value of the stock—to assist the nonselling stockholder(s) in ascertaining whether it wishes to exercise the right of first refusal. In neither agreement, the New York or Philadelphia, is the right of first refusal independent of the desire by the other party to sell.

The Supreme Court, citing *Friedman v Sommer* (63 NY2d 788), interpreted the words "exclusive right to purchase" contained in the New York agreement as bestowing an irrevocable right upon LIN. Yet, exclusive and irrevocable are not the same. Thus, the fact that each partner to the New York agreement possesses an exclusive right to buy certainly does not mean that this exclusive right may not be revoked. In *Friedman v Sommer (supra),* there was an offering plan to convert a building to cooperative ownership which granted each tenant the nonexclusive right to purchase his or her apartment at the prescribed price for a period of 30 days. Prior to the expiration of the 30-day period, the sponsor withdrew the offer to plaintff to purchase her apartment. When the sponsor refused to allow plaintiff to buy at the lower price contained in the relevant amendment, she commenced an action. According to the Court of Appeals therein, "[i]nasmuch as the sponsor's offer was revocable, its withdrawal prior to acceptance by the tenant precluded the formation of a contract of purchase and requires dismissal of the tenant's complaint" (at 790). *Friedman v Sommer (supra)* certainly does not stand for the proposition that an offer made pursuant to an exclusive right may not therafter be revoked.

The fact is that LIN, prior to receiving notice of Metromedia's withdrawal of the offer, never indicated a willingness to exercise its right of first refusal and match Bell's terms, and this is equally the situation with regard to the New York and Philadelphia operations. While LIN did make a timely request for an appraisal of the value of Metromedia's stock in the Philadelphia business, it did not express an intention to meet Bell's offer but merely demonstrated an interest in considering that offer. Indeed, the distinct impression created by the discussions carried on between Metromedia and LIN after Metromedia advised LIN of the agreement with Bell is that although LIN did desire to purchase Metromedia's interests in both CTC and AWACS, it wanted better terms than those accepted by Bell. Only when its negotiations with Metromedia proved unsuccessful, and Metromedia had in good faith rescinded the offer, at which point there was no longer any third-party sale to preempt, did LIN finally endeavor to exercise its right of first refusal under the terms set forth in Metromedia's notification. To find, as LIN urges, that Metromedia's offer constitutes an irrevocable option to buy despite the subsequent cancellation of the sale would, in effect, elevate the right of a first refusal holder over that of an owner

who decides not to sell, thereby compelling an unwanted sale. No reasonable construction of the two agreements involved here nor applicable contract law mandates such a restriction on the right of an owner to dispose, or not to dispose, of its property as it wishes. Of course, if LIN had accepted the offer(s) before it (they) was withdrawn by Metromedia, then, the parties having entered into a binding contract while the third-party sale was still in effect, Metromedia would have been obliged to sell its interests in either CTC or AWACS or both, as the case might warrant. The right of first refusal, however, is contingent upon the existence of a valid, outstanding contract to a third party. If there is no such contract, then there is nothing to accept or refuse.

Therefore, the order of the Supreme Court, New York County (Stanley Parness, J.), entered on December 18, 1987, which denied appellants' motion to dismiss the complaint pursuant to CPLR 3211, should be reversed on the law, and the motion to dismiss granted, with costs and disbursements.

Order of the Supreme Court, New York County (Stanley Parness, J.), entered on December 18, 1987, which denied appellants' motion to dismiss the petition pursuant to CPLR 7601 to compel an appraisal of the value of Metromedia's interests in AWACS and to purchase those interests at the appraised value, should be reversed on the law, and the motion to dismiss the petition granted, with costs and disbursements.

KUPFERMAN, J. P., SULLIVAN, ROSENBERGER and SMITH, JJ., concur.

Two orders, Supreme Court, New York County, both entered on December 18, 1987, unanimously reversed, on the law, and the motions to dismiss are granted. Appellants shall recover of plaintiffs-respondents/petitioners-respondents one bill of $75 costs and disbursements of these appeals.